May it please the court. My name is Mark Caldwell. I'm representing Mr. Castaneda this morning in the Social Security Appeal. I would like the court permission to preserve two minutes for rebuttal and I will keep track of my own time. I hate to start off on a negative point, but I caught a typographical error. I hate that. You can just give that to the court. OK. Good. Thank you. There are a variety of issues in this case, but I want to focus on two that I think are the most important. The first one is a dispositive issue, in my opinion, and that is the claimant's symptom testimony. Even the district court recognized that the claimant said basically he spends most of his time lying down. A person has to spend most of their time lying down, can't work. The other issue that I think is important is the consultative examination and the non-examining state agency physicians that essentially adopted the consultative examination, where that evaluator, who I think wrote a page and maybe two pages worth of a report, didn't review the critical background medical records in this case. And they are indeed critical. Can I ask, I assume you're referring to Dr. Hughes and his case development sheet. I had trouble understanding that argument because when I went through the case development sheet, it was quite lengthy. It seemed to go through all of and summarize all of the reports or many of the reports. And he ended up concluding that the client, your client was, his disability was non-severe, which I understood as saying that he failed at step two. So can you explain what was the problem with Dr. Hughes' analysis, the case development sheet? Yes, Judge, I can. I don't think it was Dr. Hughes' analysis. If you'll go to excerpts of record, page 138, you'll see it's the disability examiner. This is the bottom of the page. It's the disability examiner, a non-medical personnel of the state agency, is saying to the doctor, doctor, if you make this non-severe, you'll have to call the doctor that completed the medical source statement. I feel, the disability examiner, feel that we should go ahead and agree with the medical source statement in the file and make this residual functional capacity as medium. But that's actually a higher, in other words, a greater disability, because it looked like the doctor was saying, this doesn't even meet step two. This isn't even severe. That's my point. The non-examining doctor is just basically saying, get this off my desk. I'm not even going to look at this as even being a severe impairment, a de minimis step. But the disability examiner steps in and says, oh, no, no, no, no, that'll be more work for us. We'll have to actually call the consultative examiner. So don't do that. Rubber stamp the consultative examiner. I understand that's not the best practice. It may not be the best practice, but it certainly doesn't say that the person is disabled. I mean, it says the person, the state physician didn't even, which was consistent, I think, with what Dr. Cunningham and others found, didn't even find him to meet step two. So why does that help you in saying that the individual was actual, Mr. Castaneda was actually disabled? Well, the problem with the assessment that was ultimately adopted by Dr. Hughes, which really was a rubber stamp of the Cunningham assessment, is that Dr. Cunningham didn't review any of the background medical records. Dr. Cunningham didn't look at the MRI that showed an 80 percent collapse at one disc, a 50 percent collapse at another one. Didn't show the CT scan that showed significant degenerative changes, all of those things. And that is absolutely crucial because the commissioner's own regulations at 20 CFR 404.1517 and 1519N say the state agency is supposed to send those records to consultative examiners. This gets me back to my first question, which is I'm having trouble saying he only relied on Dr. Cunningham's reports, which is what you indicated in your briefs, when this case development sheet seems to go through all of the various reports, including Dr. Papadopoulos's work, et cetera. Yes. So what's the basis for saying he looked only at Dr. Cunningham's information, given the extensive nature of the case development sheet? Keep in mind, the state development sheet that you're referring to is the summary by the non-medical disability examiner. When you look at the actual form by Dr. Hughes, he refers to the CEMSS, consultative examiner medical source statement. So what he is actually looking at is either what a non-medical person summarized or the consultative examiner. But isn't it very telling that the consultative examiner and the non-examining doctor are dead on with every single limitation? Isn't that a rubber stamp? Sure it is. And I think that's very significant. So if you take insubstantial evidence and you have another person say, I agree with insubstantial evidence, two insubstantial evidences don't equal substantial evidence. And that's the key in this case. So I think you have hit upon a very important issue, and that is the commissioner using these doctors who are not looking at all of the evidence in the record. And, you know, I've done a lot of these cases, and this case has some of the most significant objective findings I've ever seen, an 80 percent disc collapse, my God. So that's what I think is very important. Then, of course, I want to, before I move on, I want to come back to one issue. I argued this issue before another panel just a couple months ago. And the panel decided the case on other issues, but it gave a one-sentence answer to this argument. It said the appellant is arguing that non-examining state agency physicians can't be substantial evidence, and that argument is foreclosed by Richardson v. Perales, the Supreme Court decision. With all due respect to that panel, that was dead wrong. I went back and I looked at Richardson v. Perales, and Richardson v. Perales was all based upon examining doctors, and not examining doctors who had the deficiencies that we're talking about here, but examining doctors who really did a very thorough job under the facts of that case. So that argument is not foreclosed, and it is an issue that is crucially important, because, I mean, I can tell you from my own experience in representing these people, this is all I do, thousands of people, at least at the Phoenix Hearing's office, have been denied based upon opinions of doctors who have never even laid eyes on the claimant. This is a very important issue. I guess I'm a little confused, because it seems like other than the nurse practitioner's statement, all of the evidence was consistent. I mean, Dr. Cunningham didn't see any problem. He came in. He did the straight leg raise. There was no indication that muscles on one side were weakened. Dr. Papadopoulos looked at him, didn't recommend any surgery. So there wasn't really very much inconsistency that I saw in the record. Maybe you can point out to me where the inconsistency is. Well, you're right and you're wrong. You're right that there's no inconsistency between the doctor who didn't review the records and the doctor who never examined the claimant. They're very consistent. Dr. Cunningham examined the patient. Now, the one you were saying, he didn't look at the MRI, which I think was, you know, the month ahead. I don't know that that's a fatal flaw, and maybe you can point out why. He didn't look at anything. He didn't look at anything. He looked at the patient, right? Period. He didn't examine the patient. And the findings you mentioned, I'm going to keep track of my time here, because I see I'm coming up on my rebuttal, but the findings you mentioned are significant only if there is a nerve root lesion. That's what results in the straight leg raising. That's what results in muscle atrophy of the lower extremities. That isn't what's involved in this case. This man doesn't have a nerve root lesion. Everybody says he doesn't, and I agree with that. Those findings are not germane to the reason this man is disabled, and that's the degenerative disease of the spine itself, not a nerve root lesion that would cause radicular symptoms. May I reserve? One other question. On Dr. Cunningham, he makes reference to a gait coordination exam dated 11-1503, which was about 15 days before his report. So he at least references that. Who did that exam? I don't know. He doesn't tell us. I can't answer your question. It's nonanswerable. Okay. We just felt that. Thank you. But we do know he did look at those other things. Thank you, Chief. Good morning, Your Honors. Eric Chin for the Commissioner. Can you answer that question? In Dr. Cunningham, where he references this exam dated 11-1503, what exam that is talking about? I don't have the transcript in front of me. I left it in my lug bag. I am going to assume that that's Dr. Dugan from MedPro Orthopedics. But I would go back and look and pull it up for you, Your Honor. Can you just take me through some of the facts here to see whether I have it down correctly? I'd hate to make a judgment based upon, you know, misunderstandings that I may have from looking at this record. I'm just trying to track the history of this medical information that we have before us. And I start with the fact that there was an MRI taken on October 22, 2003. That was before Dr. Cunningham did this examination, correct? I believe so. Okay. And he does refer or there's some indication here that he was aware that there was an MRI, but he never looked at it. Am I correct about that? I believe so. Okay. And there's something in the record that says that the totality of Dr. Cunningham's examination was five minutes. There was a representation by counsel to that effect. There's nothing in the record that says anything to the contrary. Am I correct in assuming that that was the total extent of Dr. Cunningham's examination? I can't answer that, Your Honor. I do not know how long Dr. Cunningham's had. The lawyer represented that, and I have nothing to, you know, counter that. So going back to the MRI, which Dr. Cunningham did not look at in the five-minute examination, apparently, it does show severe degenerative disc disease at the L4-5, and it goes on to show other things. So we know that the MRI talks about severe degenerative disc disease. And in January of 2004, the clinic, apparently this is not a wealthy person that can, you know, really afford private doctors and there's nurse practitioners that this person uses. The clinic referred Castaneda to Dr. Papadopoulos. That's where he gets in the act, for surgical consultation. And Papadopoulos agreed that the MRI showed a significant degenerative disc at L4-5. And Papadopoulos then ordered a discogram of his lumbar spine. It was performed in 2004, revealed disc degeneration at the L3-4 and L4-5, as well as some spondylosis. And then it goes on, then, the center ordered an updated MRI, which revealed multilevel degenerative disc disease with left-sided paracentral bulge slash protrusion. And then Stevens got in the act, and he recognized there was decreased range of motion, and they agreed that no surgery would be beneficial. You know, sometimes somebody is so far gone that surgery is not going to be useful. It doesn't necessarily mean that the person is not severely injured. People have cancer, and, you know, surgery is not recommended. So I don't see where that necessarily supports the fact that this person was not injured. It could be to the contrary. The person was so severely debilitated that surgery would not have made a difference. Anyway, let's go on. In March 2005, he's prescribed some pain medication. And it seems to be an awful lot. 30 milligrams of MS content twice a day, 10 milligrams of Flexible three times a day, and up to 10 milligrams of Oxycodone every six hours. People get hooked on that stuff, from what I understand, sometimes as well. Seems to me that that's pretty severe. So what did Cunningham have in front of him during this five-minute examination? From my view of the record, and you tell me if I'm wrong, we already agree that he didn't look at the MRI. It's unclear whether he reviewed any other medical records. For example, the September 2003 x-ray, that was extant at the time. He did not have access to the results of the March and April steroid injections, the June 2004 discogram, the November 2005 updated MRI, or the reports from Papadopoulos. The physical therapist, the Center for Spinal Disorders, and the Phoenix Pain Management Center. Don't you really think, unless I'm missing something, that, you know, that Cunningham should have at least have taken a look at those records, or that there was some sort of common sense here based upon these types of injuries here? Your Honor. Have a complete record here and have a reevaluation? You ask me what did Dr. Cunningham have in front of him? He had the most important piece of evidence. He had the claimant. His nature is an examining physician. He had the what? He had the claimant. I'm sorry to hear that. He had the claimant. The claimant, right. Correct. And he's an examining physician. That is the nature. Forget about the records. Forget about all this other information from Papadopoulos and everybody else. Just the claimant is sufficient, right? The purpose of the constitutive exam is the examination of the claimant. The distinction that you just recited a number of the objective medical evidence in this case. Nobody's disputed that this man has a degenerative back condition. That's not the issue. In Social Security law, the issue is whether someone is so functionally limited from a medically determinable impairment that they can't perform any other work. But I'm going to ask Papadopoulos that question. I mean, this guy had a nurse practitioner who's not a medical person. We understand that. There's some body of law recently that recognizes that maybe we should reach out a little bit more to people like but not everybody can afford medical help, I guess, these days, right? Your Honor, this isn't a condemnation of the nurse practitioner or the modern treating team. What happened in this case is the ALJ actually did better than look to Nurse Ridges' one-page opinion. How do you know what Dr. Papadopoulos would have said if he was asked the ultimate question, focused specifically on whether this was a Step 4 situation? Your Honor, what's clear from Dr. Papadopoulos' records and Dr. Stevens' and Dr. Cunningham's are that they had shaped, according to their records from what I read, this guy's taken all sorts of pain medication. You're telling me that just that it was that he should not have at least asked Dr. Papadopoulos, you know, what do you think? Your Honor, if they had asked Dr. Papadopoulos what he thought, he would have responded, based on my examination, this claimant has 5-by-5 strength. He has no he has 5-by-5 strength. That's except your record 203 to 205. He has no deficit in strength. His sensation is intact. His reflexes are intact. His recommendation is conservative treatment. Up to the point that he saw Dr. Papadopoulos, he hadn't tried any conservative treatment except some medication. Let me ask you about that. I know Dr. Papadopoulos basically recommended against a fusion. And the other doctor, was it Stevens? Yes, Your Honor. As well, he said that because this gentleman had deficiencies in various parts of his back, that he didn't think also a fusion would be that effective. The question I had, though, is did the ALJ misread that by taking that information and then saying, therefore, the claimant's back impairment is not as severe as alleged? In other words, I read them saying, you know, try conservative treatment here. We don't really think the risk of surgery, and it's a big deal to have back surgery, is necessarily going to fix this situation. Instead, though, the ALJ says it's not as severe as alleged. So I'm just wondering if there was kind of like a passing in the night on interpreting those records, if you would address that. Thank you, Your Honor. I don't believe so. The standard on review of substantial evidence, whether a reasonable person could look at this record and come to the conclusion that the ALJ did. What the ALJ saw in this record as a whole, there's no question, it's a 51-year-old man with a degenerative back condition. However, every single finding from the start to the end of this record is that the claimant has normal strength, good muscle bulk and tone. He's got intact reflexes and sensation. He has a normal gait. That's from Dr. Cunningham and Dr. Dugan. He's got full range of motion, according to Dr. Cunningham. We looked at, we not only sent him for a consultative exam, but we looked at his treating sources. Nurse Ridge didn't treat, didn't examine, really, the claimant. What she did is she sent the claimant out to specialists. She sent him to a neurosurgeon, Dr. Papadopoulos, and she sent him to an orthopedic specialist, Dr. Stevens. They both recommended that the claimant should follow conservative treatment. They arrived at those recommendations right after announcing what their findings were, that is, full strength, intact sensation, intact reflexes. The focus in Social Security is to what extent does the impairment functionally limit this person, functionally limit the claimant. In this case, whether surgery is called for for his impairment doesn't speak to whether he's functionally limited here. He has full strength, and he can move. But that, I was just, on that point, though, the ALJ said, well, because they recommend against surgery, his impairment is not as severe as alleged. That seems to be kind of a disjointed conclusion. If you take the term severe out of the context of Social Security, but severity has a very well-defined in the regulation meaning as to what it is. I understand that within Social Security, but I think the doctors, I mean, is the ALJ talking about legal severity as in terms of the stages of Social Security, or talking about severity in terms of disability generally? I think it's fair that he's talking about both. I'm just curious. Why is it that Hughes asks for, I'm concerned about whether this is a record that was sufficiently developed, quite frankly. I know there's a basic principle that the ALJ has a duty under proper circumstances to make sure we have a fully developed record. Here, Hughes initially said, unfortunately the most current consultative exam is over six months ago, and since this is a reconsideration with recent lumbar epidural block, I believe that a current consultative exam would be indicated to adequately evaluate for RFC. Why should we not come to the same conclusion? Your Honor, because Dr. Hughes made a statement at that point in the development of this case. He was at the reconsideration level. There was an MRI. There was all this other information that wasn't before. Correct. There was subsequent development from the claimant and the claimant's attorney as well. More current records that came in, more current examinations by treating physicians that still report normal findings in terms of function. The ALJ has a duty to develop the record further, only where the record, the evidence is ambiguous or inadequate to make a decision. Neither situation existed in this case. Thank you. Thank you, Your Honor. I have very little time. This tells me I have 10 minutes, but it's wrong. It's wrong. Well, he had minutes remaining on his time. He had about a minute and a half. A minute and 42 seconds, actually, I think. Okay, two minutes. Not that I'm counting. Let's put it at two minutes, please. Thank you. Thanks for the extra few seconds there. Well, I don't want to start until we're ready to go. We'll go over with Mr. Chin trying to explore some issues as well. Okay, there we go. Okay. I don't have much time, so let me just hit a couple things. But I have to come back to something, Judge McCowan. I can't find the item you're referring to in the Cunningham report where you were asking me the question about what he had to look at. I've looked at it three times. I still can't find it. Can you re-ask me that question, please? Well, on page 162, which is also 174, depending on where you count from. Well, bottom paper. Bottom, in the handwritten note, he talks about an exam date at 11-15-03. It may not be significant. I just didn't know what he was talking about. You can't be referring to the bottom number, Judge. That's a release form. Are you looking at the top right-hand corner or the bottom center corner? No, I'm looking at 162, which is the date stamp up in the upper right-hand corner. Upper right-hand corner. Okay. Okay. That's the non-examining positions assessment form. That wasn't Dr. Cunningham. Right. But what does that refer to? Exam date at 11-15-03. I can't answer that question. I just don't know what he's referring to. It would be helpful if he told us, wouldn't it? Okay. Here it is, 11-15-03. That's Cunningham. Okay. So now I can answer your question. The non-examining doctor, when I was answering Judge Akita's questions, I was saying, well, you know, the non-examining doctor is relying on Cunningham. That's what this is. This is the non-examining doctor relying on Cunningham. But what is Cunningham relying on? Nothing. And that's what Judge Block was talking about. Everybody else relied on Cunningham. Again, please. Everybody else relied on Cunningham's report. Well, but that's the problem, isn't it? Yeah. Okay. So we got that out of the way. I have to finish with one thing. I want to bring the Court's attention to a case called Orn, O-R-N. It is 495F3rd. The pinpoint sign is 635. And the reason I would like the Court to pay attention to that is that case says you can't reject a doctor's opinion for findings not germane to that opinion, which is why all this business about reflexes and strength in the lower extremities, all of it's true, but all of it's irrelevant. This is not a case resolving with radicular symptoms. This is a case with spinal degeneration. And the fact that you have normal reflexes has nothing to do with whether you have spinal degeneration. Thank you for the extra time. Thank you. I thank both counsel this morning for your argument. The case just argued Castaneda v. Estruis submitted.
judges: McKeown, Ikuta, Block